In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1371

RIK LINEBACK, Regional Director
of the Twenty-Fifth Region of
the National Labor Relations
Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

*Petitioner-Appellee,*

*v.*

IRVING READY-MIX, INC.,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:10-cv-00346-JD-RBC—**Jon E. DeGuilio**, *Judge.*

ARGUED JUNE 9, 2011—DECIDED AUGUST 5, 2011

Before MANION, WOOD, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* The district court issued an injunction under section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), ordering respondent Irving Ready-Mix, Inc. to stop certain unfair labor

practices pending a final administrative decision by the National Labor Relations Board. Irving Ready-Mix has appealed, but we find no error or abuse of discretion by the district judge. We affirm.

I. *Factual and Procedural Background*

Respondent Irving Ready-Mix, Inc. sells, delivers, and installs ready-mix concrete from its five plants in northern Indiana. For many years, the ready-mix concrete truck drivers employed by Irving Ready-Mix have been represented by the Chauffeurs, Teamsters & Helpers, Local Union No. 414, a local of the International Brotherhood of Teamsters. A collective bargaining agreement was in effect from June 1, 2005 through May 31, 2010.

As the agreement's expiration date neared, the union and management met to negotiate a new agreement. The employer insisted that a new agreement would have to allow it to reduce its total labor costs (wages plus benefits) from approximately $43.00 per hour to about $31.00 per hour. The union refused, management stuck to its position, and the old agreement expired on May 31, 2010 without a replacement. The drivers went on strike on June 1st.

The employer then took the actions at the center of this lawsuit. It announced that it no longer recognized the union as the drivers' collective bargaining representative. Instead, it contacted the drivers directly, offering to employ them individually on new terms consistent with management's last offer. A few drivers resigned from

the union and returned to work, including one member of the union's bargaining committee. The strike ended on July 19, 2010, and more drivers returned to work at the lower wage rates and on terms less favorable than those of the old collective bargaining agreement.

The union filed charges of unfair labor practices with the National Labor Relations Board. The charges relevant to this appeal all stem from the employer's refusal to recognize the union after the old collective bargaining agreement expired, despite the absence of evidence that the union had lost support of a majority of the drivers. An administrative law judge heard evidence from the parties on September 29 and 30, 2010. The next week, on October 5, 2010, NLRB regional Director Rik Lineback filed this petition in the district court seeking a section 10(j) injunction pending a final decision by the Board.

Before the district court ruled on the injunction request, the ALJ issued a decision finding that all but one of the unfair labor practice charges had merit. First, the ALJ determined that the employer was subject to the unfair labor practices restrictions of the National Labor Relations Act (NLRA) as a result of the type of collective bargaining agreement it held with the union. Second, the ALJ concluded that the employer violated two of those restrictive provisions. We elaborate briefly on the ALJ's conclusions.

In the first step of his analysis, the ALJ found that the employer's collective bargaining agreement with its employees was made pursuant to section 9(a) of the NLRA, 29 U.S.C. § 159(a). Under this section, a union

chosen for purposes of collective bargaining by the majority of employees in a unit is considered the exclusive representative for negotiating conditions of employment. Other provisions of the Act prohibit practices that interfere with this section 9(a) relationship. The relevant provision here is section 8(a), which prohibits unfair practices by the employer. See NLRA § 8(a)-(b), (d); 29 U.S.C. § 158(a)-(b), (d).

To avoid this result, the employer argued that its relationship with the union was governed not by section 9(a) but by section 8(f), under which it would have been excepted from the restrictions of section 8(a). Section 8(f) of the NLRA allows an employer "engaged primarily in the building and construction industry" to enter into a collective bargaining agreement with a union before the union has established majority status.[1] See 29 U.S.C. § 158(f). As a result of this special situation, section 8(f)

---

[1] Section 8(f) was enacted to accommodate the special needs of the building and construction industry. See H.R. Rep. No. 741, at 19-20 (1959). In *Operating Engineers Pension Trust v. Beck Engineering & Surveying Co.*, 746 F.2d 557, 563 (9th Cir. 1984), the Ninth Circuit explained that, in adopting section 8(f),

Congress recognized that the representation procedures prescribed in Section 9 of the Act were largely unsuited to the peculiar circumstances of the construction industry, where employers ordinarily hire on a project-by-project basis . . . [and] where an employer who might employ no one unless he is working on a project, must nevertheless know his anticipated labor costs before making a bid and must have access to a readily available pool of skilled craftsmen.

agreements are not subject to the full set of unfair labor practices restrictions like traditional section 9(a) agreements. Under section 8(f), the employer's unilateral termination of recognition after expiration of the collective bargaining agreement would have been permitted. The ALJ rejected the employer's argument, relying on Board precedents that ready-mix concrete employers are not "engaged primarily in the building and construction industry" within the meaning of section 8(f).

The ALJ also noted that the employer's agreement with the union exhibited "no evidence" that it was a section 8(f) agreement. The employer and the union had entered into at least four consecutive five-year contracts. Those contracts allowed new employees thirty days to join the union, rather than the seven days permitted in contracts under section 8(f). Further, the drivers' employment with the employer was stable and long-term, not the sporadic and site-specific work that characterizes many construction jobs for which section 8(f) was designed. Concluding that section 9(a) controlled the parties' relationship, the ALJ then found that the employer violated subsections 8(a)(1) and 8(a)(5) by communicating directly with the drivers during the strike and unilaterally changing the terms of the drivers' employment.

A few weeks later, on January 28, 2011, the district court granted the Director's motion for a preliminary injunction pending a final decision by the Board. The court ordered the employer to recognize the union as the drivers' exclusive collective bargaining representa-

tive; to restore wages, benefits, and working conditions to what they had been under the old collective bargaining agreement; and, to stop dealing directly with individual employees regarding wages and other terms of employment. The employer then filed this appeal.

## II. *Analysis*

We discuss first the applicable law governing the injunction and then turn to the specific factual and legal issues concerning the employer's attempt to take advantage of section 8(f) to withdraw recognition from the union.

### A.  *Section 10(j) of the National Labor Relations Act*

Under section 10(j), a district court may order injunctive relief pending the Board's final disposition of an unfair labor practice claim if such relief would be "just and proper." 29 U.S.C. § 160(j); *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 499 (7th Cir. 2008). We review the district court's decision to grant interim relief under this section for an abuse of discretion and reverse only if its decision depends on "faulty legal premises, clearly erroneous factual findings, or improper application of the criteria governing preliminary injunctive relief." *Spurlino Materials*, 546 F.3d at 500, quoting *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996).

An injunction granted under section 10(j) is an "extra-ordinary remedy" and should be granted only in those

situations in which effective enforcement of the Act is threatened by delay in the Board's dispute resolution process. See *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 297 (7th Cir. 2001). The district court must consider "the lack of an adequate remedy at law, the balance of potential harms posed by the denial or grant of interim relief, the public interest, and the petitioner's likelihood of success on the merits of its complaint." *Spurlino Materials*, 546 F.3d at 500, quoting *Francisco Foods*, 276 F.3d at 286. This final requirement does not ask the district court to pass on the merits of the underlying case; rather, the court evaluates only on a preliminary basis the Director's probability of success before the Board. See *Francisco Foods*, 276 F.3d at 287; *Electro-Voice*, 83 F.3d at 1567. In this case, the district court did not issue its decision until after the ALJ issued a decision, but a district court need not wait for such a preliminary decision. See, *e.g., Lineback v. Printpack, Inc.*, 979 F. Supp. 831, 858 (S.D. Ind. 1997) (issuing section 10(j) injunction before ALJ ruled). The goal is to protect the integrity of the collective bargaining process and to preserve the Board's power to provide effective remedies for violations despite the "notoriously glacial" pace of Board proceedings. See *Kinney v. Pioneer Press*, 881 F.2d 485, 491 (7th Cir. 1989) (vacating denial of section 10(j) injunction), quoting *Boire v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 479 F.2d 778, 788 (5th Cir. 1973).

Here, the district court determined that the Director presented sufficient evidence for each of the four elements such that a section 10(j) injunction was warranted. Finding the employer's practices to be "enor-

mously destructive" to the union's organizational efforts, the court had no trouble concluding that the union had established irreparable harm. This conclusion was clearly correct. We have previously found circumstances such as these — a decline in the union's membership, loss of employee benefits, and ongoing erosion of the employer-union relationship — to be sufficient to establish irreparable harm. See *Spurlino Materials*, 546 F.3d at 500-01 (affirming section 10(j) injunction on similar facts and noting the probable inadequacy of the Board's eventual remedy); see also *Francisco Foods*, 276 F.3d at 297 (reversing denial of section 10(j) injunction); *Barker v. A.D. Conner Inc.*, ___ F. Supp. 2d ___, ___, 2011 WL 2683164, at *16 (N.D. Ill. July 11, 2011) (granting section 10(j) injunction). The employer here does not even challenge the district court's finding of irreparable harm. Nor does the employer dispute the district court's determinations as to the balance of harms or the public interest. The issue for our review is the district court's assessment of the Director's likelihood of success on the merits — an assessment we review for clear error. See *Electro-Voice*, 83 F.3d at 1570. Giving deference to the findings of the district court and some measure of deference to the view of the ALJ, we consider whether the Director has "some chance" of succeeding before the Board. *Spurlino Materials*, 546 F.3d at 502.

B.  *Classifying the Ready-Mix Concrete Business*

The nature of the employer's obligations following the expiration of the collective bargaining agreement

depends on whether the agreement was constituted according to NLRA section 9(a) or section 8(f). If Irving Ready-Mix as a ready-mix concrete company qualifies under section 8(f) as "an employer engaged primarily in the building and construction industry," then it is not subject to some of the NLRA's unfair labor practice restrictions in section 8(a) and was entitled to withdraw recognition from the union. See *Engineered Steel Concepts, Inc.*, 352 N.L.R.B. 589, 600 (2008), citing *John Deklewa & Sons*, 282 N.L.R.B. 1375 (1987), enforced sub nom. *International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988). If the employer does not qualify under section 8(f), then the union was entitled to a rebuttable presumption that a majority of drivers still supported it as the exclusive collective bargaining representative pursuant to section 9(a) even after the old agreement expired. *Engineered Steel Concepts*, 352 N.L.R.B. at 600; *St. John Trucking*, 303 N.L.R.B. 723, 729 (1991). The employer has made no attempt to rebut that presumption. Thus, if the employer is not covered by the section 8(f) exception, its withdrawal of recognition violated section 8(a). We turn now to this principal issue.

Ready-mix concrete, involving the delivery of fresh wet concrete manufactured at a plant to a work site in a transit mixer truck, is not a recent innovation.[2] This

---

[2] See F. Biasioli, "Ready Mix Concrete: An Old-New Material for the 21st Century" in *Creating with Concrete*, eds. Ravindra K.

(continued...)

court and the Board have had occasion to address the activities of ready-mix concrete companies in several cases. The Board has previously decided this very question under section 8(f) and concluded that a ready-mix concrete company is not an "employer engaged primarily in the building and construction industry." Irving Ready-Mix does not contend that it presents a novel claim here. Rather, it suggests that the Board precedents on which the ALJ and the district court based their decisions were wrongly decided.

The ALJ and district court relied on *J.P. Sturrus Corp.*, 288 N.L.R.B. 668 (1988), in which the Board agreed with an ALJ's finding that ready-mix concrete delivery was not considered "construction" for purposes of section 8(f). There, the ALJ looked to prior Board precedent stating that ready-mix concrete delivery did not fall within the meaning of "construction" under NLRA section 8(e) and extended that line of reasoning to the "building and construction industry" under section 8(f).[3] The Board added that although the "drivers occasionally, and at

---

[2] (...continued)
Dhir, Peter C. Hewlett, and M. Roderick Jones (Thomas Telford Publishing 1999), 170 (discussing the scientific development of ready-mix concrete in the early 1900s).

[3] Section 8(e) provides another exception to the NLRA's unfair labor practices provisions for agreements between labor organizations and an employer "in the construction industry" relating to the "contracting or subcontracting of work to be done at the site of construction." 29 U.S.C. § 158(e); see also *Inland Concrete Enterprises, Inc.*, 225 N.L.R.B. 209 (1976); *Island Dock Lumber, Inc.*, 145 N.L.R.B. 484 (1963).

their own discretion, assist the contractor at the construction site with screeting and spreading of concrete, after they have poured it," such incidental tasks did not bring the company within the building and construction industry as required by section 8(f). 288 N.L.R.B. at 668.

Since *J.P. Sturrus*, the Board has repeatedly held that ready-mix concrete delivery companies and similar businesses that deliver construction materials to job sites are not engaged in construction for purposes of section 8(f). See *Engineered Steel Concepts*, 352 N.L.R.B. at 602 (noting entire line of *J.P. Sturrus* cases and concluding that employers engaged in the transportation and delivery of scrap steel were not engaged primarily in the building and construction industry and, as a result, could not enter into a section 8(f) relationship); *Mastronardi Mason Materials Co.*, 336 N.L.R.B. 1296, 1306-07 (2001) (relying on *J.P. Sturrus* for classifying agreement between ready-mix concrete employer and union); *Techno Construction Corp.*, 333 N.L.R.B. 75, 81-83 (2001) (discussing the *J.P. Sturrus* holding and using it as guidance to refine the range of work comprised by the "building and construction industry"); *St. John Trucking*, 303 N.L.R.B. at 730 (acknowledging teaching of *J.P. Sturrus* and holding that an employer engaged in the transportation and delivery of stones, sand, and commodities at job sites was not engaged in the building and construction industry for purposes of section 8(f)).

Like other construction material manufacturers and suppliers, ready-mix concrete falls in a grey area between construction labor, such as carpentry for framing homes,

and manufacture of building materials, such as bricks or nails. But section 8(f) requires that a line be drawn somewhere and drawing that line is more the Board's job than it is ours. As a general matter, we defer to the Board's judgment with respect to such specialized issues of labor law. See *Local 15, IBEW v. NLRB*, 429 F.3d 651, 655-56 (7th Cir. 2005). Here, we follow the Board's consistent and reasonable judgment that ready-mix concrete suppliers, like other companies whose primary role is to deliver construction materials to a job site, do not fall within the building and construction industry for purposes of section 8(f).

The employer here nevertheless insists that *J.P. Sturrus* was wrongly decided and that we should treat it as an aberration. To support this contention, the employer relies on the Board's earlier decision in *Carpet, Linoleum and Soft Tile Local Union No. 1247 (Indio Paint & Rug Center)*, 156 N.L.R.B. 951 (1966). In *Indio Paint*, the Board held that the employer, a flooring installer, was primarily engaged in the building and construction industry within the meaning of section 8(f), as a special trade contractor. The Board noted that the legislative history of section 8(f) provided little guidance on what precise definition Congress intended the "building and construction industry" to encompass. 156 N.L.R.B. at 957. The Board adopted the "traditional meaning" of the terms as used in common parlance as well as in technical industrial parlance. *Id.*

Through its detailed analysis, the *Indio Paint* decision gave ALJs guidance regarding the scope of the term

"building and construction industry." That industry includes employers engaged in "the provision of labor whereby materials and constituent parts may be combined on the building site," but not those carrying out the manufacture and assembly of products installed by others at the construction site. *Id.* at 959. In this case, the employer's principal argument is that, under the methodology of *Indio Paint*, ready-mix concrete companies are "building and construction" companies. The employer contends that the Board's decision in *J.P. Sturrus*, which did not cite *Indio Paint*, was flawed because it broke from the *Indio Paint* precedent without explanation or justification.

In our view, the employer's argument is undermined by the Board's favorable treatment of *J.P. Sturrus* in cases involving ready-mix concrete companies over the past twenty years. If later cases had adopted contradictory positions or questioned the discrepancy, the employer's argument might carry more weight. But its argument that *J.P. Sturrus* failed to properly apply section 8(f) runs head-on into the several cases consistently upholding and applying that decision.

Contrary to the employer's contention, this pattern of Board precedent is not like the deviation we described in *Milwaukee and Southeast Wisconsin District Council of Carpenters v. Rowley-Schlimgen, Inc.*, 2 F.3d 765 (7th Cir. 1993). There, we found that the Board's decision in *Chicago District Council of Carpenters (Polk Brothers, Inc.)*, 275 N.L.R.B. 294 (1985) was a departure from the Board's otherwise consistent treatment of section 8(e) in preceding and subsequent cases. 2 F.3d at 768. As a

result, we attributed little precedential value to *Polk Brothers*, noting that when the Board "fails to distinguish contradictory decisions rendered in similar cases, it forfeits 'the deference we would otherwise show to its very considerable expertise in strictly labor matters.'" *Id.*, quoting *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 37 (1st Cir. 1989).

There was no such aberration here. The solid line of cases reiterating *J.P. Sturrus*' holding supports the district court's conclusion that the Director is likely to succeed on the merits.

We conclude that the district court did not err. We AFFIRM its order.